## SHARP v. WHITESIDE and others.

## WHITESIDE v. SHARP.[1]

*(Circuit Court, E. D. Tennessee, S. D. October 1, 1883.)*

1. JURISDICTION—REMOVAL OF CAUSE—DISSOLVING PRELIMINARY INJUNCTION GRANTED IN STATE COURT.

A circuit court of the United States has no revisory power over the chancery court of a state, but when, before removal of a cause from the state court, an *ex parte* preliminary injunction has been granted, it may in a proper case dissolve such injunction.

2. PRIVATE PROPERTY USED FOR PARK—CONTRACT TO EXCLUDE PERSONS NOT BROUGHT BY CERTAIN PARTY—TAX ON PROFITS—INJUNCTION.

The owner of what is known as the Point of Lookout mountain, a favorite resort on account of the extended view therefrom, who was also the owner of a chartered turnpike which was a regular toll road leading up the mountain nearly to the Point, inclosed her ground as a park and charged an entrance fee from visitors. Subsequently she entered into a contract with a certain party, by the terms of which he was to carry all passengers over her turnpike instead of over another route leading to the Point, and was to have the exclusive privilege of bringing or conveying persons into the park. Complainant, who was engaged principally in the business of carrying visitors to and from the park, sought to enjoin the owner from refusing admission thereto to such parties carried there by him as might tender the usual admission fee. *Held*, that the fact that the park had long been a popular resort for sight-seers, that an admission fee was charged, and that a tax was imposed by the state on the owner for the privilege of keeping a park, did not render the use to which the property was devoted a public use, or change the character of the property, and that the court could not invade the rights of the owner and enjoin her

1See S. C., *ante*, 150.

from carrying out the terms of her contract. *Held, further*, that if she had attempted to interfere with any of the rights of complainant in the use of the chartered turnpike such interference would not have been tolerated.

3. SAME—TAXATION BY STATE—EFFECT OF, ON CHARACTER OR BUSINESS.

That the state imposes a tax on the privilege of deriving a profit from the use of property in a certain manner does not render such use public, but rather recognizes the fact that the property is private, and subject to the control of its owner.

Motion to Modify an Injunction granted in favor of complainant Sharp in the state court, and to grant an injunction in favor of Whiteside, under her cross and supplemental bill.

*Lewis Shepherd, Key & Richmond*, and *Clarke & Snodgrass*, for Sharp.

*W. H. Dewitt* and *Wheeler & Marshall*, for Whiteside.

KEY, J. A short time since it was held that this cause had been removed to the circuit court of the United States, and the parties were allowed to perfect their pleadings. The injunctions in the cause have hitherto been granted in the state court, and a motion to modify or dissolve the injunction granted complainant Sharp under the original bill made by respondent Whiteside in the state court, has been denied by that court. It is insisted that this court has no power or right to review, change, or modify the action of the state court as to this injunction; that the question is *res judicata*. If the decree of the chancellor, under a proper condition of the cause, had been for a perpetual injunction, the truth of the position would be undeniable. This court has no revisory power over the chancery court. It cannot reverse or change its judgments or decrees. The case stands here just as it would stand had it remained in the chancery court. The authority or power of this court over the case is no greater or less than that of the chancery court would be had this court never assumed jurisdiction of the cause. The injunction referred to was not perpetual or permanent, and does not profess to be; it is temporary and preliminary. The chancellor could have dissolved or modified it, whenever, in his opinion, equity demanded it. As the cause proceeded, the time must come when this preliminary injunction would have performed its office, and would have been swallowed by one perpetual in its character, or dissolved for want of merit. It has not the substantial elements or permanent qualities belonging to stable and unyielding judgments. If the chancellor had at any time concluded that the injunction had been improvidently granted, or had the subsequent proceedings developed to his satisfaction that the complainant was not entitled to the injunctive interference of the court, he could have modified or dissolved his injunction without awaiting the final hearing of the cause. Preliminary injunctions in the courts of this state are generally and essentially *ex parte*, and the fiat awarding them is not a decree. It is an order, and the fact that, upon the coming in of the answer, a motion to dissolve was overruled, does not make the order any more a decree; it simply in-

dicates that so far the court is satisfied with the injunction. It gives no decided assurance that it shall be permanent and perpetual. The same discretion and power the chancellor would have in his court I have in this.

This court would hesitate before it would disagree with the state court upon preliminary questions. It would dislike a disagreement exceedingly. If, however, its well-considered and deliberate judgment should differ from the action of the chancellor, the judge would be derelict in his duty and unworthy of confidence should he fail to declare the law and justice of the case as his judgment and conscience should dictate, from a sensitive regard for the action and opinion of his brother judge. Judges will disagree as well as doctors.

The vital inquiry at the threshold of the consideration of the motions before us is whether the injunction granted by the chancellor under the original bill should be maintained, or shall it be modified, or shall it be dissolved. In view of the unquestioned and admitted facts as developed by the pleadings, what should be done in this respect? The questions to be considered are questions of law and equity, rather than disputed facts. There is little disagreement as to the material, essential facts. As stated in the original bill, and admitted in the answer, respondent, Florence Whiteside, is the owner of a turnpike road running from the foot to the top of Lookout mountain, chartered by the state, and the people are charged toll fees for passing over it. It is a public turnpike road. The terminus of this road at the top of the mountain is about a mile and a quarter from what is known as the Point of Lookout mountain, a celebrated part of the mountain, which is visited by many for the fine view it affords of the surrounding country, and of several of the battle-fields of the late war. There is what is styled in the pleadings a dirt road between the end of the turnpike and the Point, which runs a great part of the way through the lands of respondent, Florence Whiteside. The mountain ends abruptly at the Point, and she owns the Point and the lands back of it for a considerable distance to both brows of the mountain, so that it is impossible for vehicles to reach the Point without traveling over or through her lands. She has erected a fence across the mountain a short distance from the Point, which extends across from brow to brow, and incloses the Point and the top of the mountain adjoining it, and a gate has been made for an entrance to this inclosure, and persons have been charged a fee of 25 cents for admission to this inclosure, which is called a park. There is no question but that Miss Whiteside, the respondent, has title to the Point and park. Complainant Sharp is the owner of and operates a livery stable, and has been accustomed to carry passengers to the Point for hire, and to do this is the most valuable part of the business in which he is engaged.

Before the filing of complainant's bill Miss Whiteside, through her agents, made a contract with Owen & Co., the owners of a livery

stable, by which they were to take all their passengers for Lookout mountain over her turnpike instead of a competing one, and no passengers using hired means of conveyance to the mountain were to be admitted to the park and Point unless they had been brought there by Owen & Co.'s vehicles or horses. Complainant could pay his toll and travel the pike, but he and his passengers could not enter the park and go to the Point, though the admission fee was tendered at the gate. This gives Owen & Co. the carrying business to the Point, and for the privilege it is said that Owen & Co. agree to pay $5,000 annually.

It is also said that this arrangement is ruinous to complainant's business. He insists that as Miss Whiteside charges an admission fee to the park and Point, they become a public institution in such sense that she is bound to admit all persons of good repute who ask for admittance and tender the fee; that she cannot discriminate in favor of Owen & Co. and against complainant, but should award the same rights and privileges to both, and all like concerns. He avers his willingness to conduct his conveyances over respondent's turnpike, paying the usual toll, and to pay the admission fees for entrance into the park. An injunction was ordered and issued in accordance with the prayer of his bill. Its terms are that respondents, "each and every of them, their servants, agents, and counselors, are enjoined from discriminating against complainant in his business of carrying passengers over said turnpike road to the Point of Lookout mountain and into the park at the Point; also from refusing to admit the carriages and horses of complainant to pass over said road, and his passengers to enter the park and Point on the same terms as the horses, carriages, and passengers of Owen & Co. are permitted to pass over the road and into the park and Point; also enjoining them from refusing complainant's passengers to enter the park and Point upon their paying the customary fees, and from refusing to furnish complainant's passengers with tickets of admission to the Point at the toll-gate, as they have been doing heretofore under the contract of Owen & Co. with respondent, Whiteside, and as they continue to do the passengers of Owen & Co.; also enjoining them strictly from making or enforcing any contract with Owen & Co., or any other person, which will directly or indirectly discriminate against complainant's business, or which will secure to said Owen & Co., or any other person, any rights and privileges whatever in respect to said turnpike road, and to said park and Point, which are not accorded to complainant on the same terms."

The power of the court here invoked and exercised is a tremendous one. It appropriates the use of the respondent's property to complainant's use against her consent. It takes the property from her control in an important sense against her will. We are now discussing the case under the theory of the original bill, and without reference to the supplementary proceedings. The sovereign power of

the state, in the exercise of its right of eminent domain, may appropriate private property to the public use upon giving just compensation therefor, but this appropriation is made by some legislative act, general or special, when public necessity demands it.    The court has no power to make the appropriation.    It may be the instrument by and through which the details of the appropriation are defined, declared, and worked out.    But its act must be by reason of and within the scope of legislative authority.    There is no need of the elaboration of this question, since there is no claim predicated upon the right of eminent domain,

Aside from the right of eminent domain, there is an inherent power in the state, when necessary for the public good, to regulate the manner in which each person shall use his own property, but this power of regulation rests upon public necessity.    See *Munn* v. *Illinois*, 94 U. S. 125.

Whether, like the right of eminent domain, some legislative act must confer on the court authority to declare and effectuate this use, it is, perhaps, unnecessary to determine.    There is probably no question, but that in the case of a common carrier, when the legislature has not, in the charter or in the general law, regulated the prices to be charged upon its business, the courts may, by injunction, prevent extortion or discrimination therein to a certain extent; nor can it be questioned that the courts may compel a common carrier to receive and carry for every person such property or freights as it usually transports on its line, when the shipper has tendered the freight, and its proper costs and charges.    The common carrier is granted power to do business for the public, and owing to the public nature of its business and contracts, the courts may control it to some extent, if the legislature has failed to make any provision in regard thereto, or may confine it within the legislative boundaries, if such have been provided.    But in such instances the legislative department has impressed the property with a public character and interest; not that the legislative act could of itself make it so, but because the legislative power is the proper source of authority to determine when the public necessity exists.    Then courts may regulate the fees and charges for the use, but the court cannot impress, declare, and enforce the use.

The control which courts may have over railroads and business incidental to and necessary for their conduct and operation, such as warehousing in our great railroad centers, is based upon public necessity.    Railroads do nearly all the business of interior transportation.    The public is compelled to use them exclusively.    There is scarcely anything to compete with them where they operate.    Hence, discriminations or extortion cannot be tolerated in their management.    If they refuse like facilities to their shippers, or discriminate in rates or otherwise, courts may compel them to be just.    The cases of *Munn* v. *Illinois* and *Adams Exp. Co.* v. *L. & N. R. R.*,

and other cases referred to, proceed on this theory. There is no such ground for jurisdiction in the case under consideration. There is no necessity, public or other, for people to visit Lookout Point. That is a mere matter of taste, pleasure, curiosity. Commerce, the public weal, social order, the public health or comfort, have nothing to do with it. Already the courts have gone "to the verge of the law" in the direction asked for here, and it is apprehended that no authoritative case can be found which will carry us as far as we are now asked to go.

Now, take the case in hand, Miss Whiteside, as the owner of the Point and park, or her privies in estate, at one time might have excluded all persons from entering upon either. It, to say the least, has been private property. No legislative act has declared a public use in it. If such use has been impressed upon it, it has been done by her. Holding the absolute title, she could control it as she liked, so long as she did not use it to the injury of others. She could have donated it to a public use generally and absolutely, or to such limited use as she might prescribe, or she could have preserved its private character. As her private property she had the right to inclose it; after its inclosure she had the right to admit as many or as few within the inclosure as she pleased. Because she saw fit to admit some persons upon payment of a given fee gave to others no right to be admitted on the tender of a like fee. They were in no worse or different position than before any admissions were made. No loss had been sustained by them; no consideration had passed from them. Nothing can be found on which to predicate an equity in their favor. The fact that people may have been admitted to such an extent as to make the business of carrying passengers to the Point profitable to complainant raises no equity in his favor. It was brought about by no use of his property or expenditure of his money. Respondent has as much right to require him to contribute such portion of profits as might be deemed equitable, which she has enabled him to make by the allowance of great numbers to go to the Point, as he has to demand of her the use of her property that his business may prosper. Neither he nor the public has any greater right to the property than she has given them. There is no greater obligation on her part to contribute to the public use, gratification, or pleasure than rests upon others. She holds her property subject to her control just as others hold theirs, until it is applied to the public use by an act of the sovereign power through methods known to the law, or until she appropriates it by her voluntary act to the use of the public. A court cannot appropriate it to such purpose against her consent. She can determine who shall be admitted within her premises and who shall be refused admission. Of course, this remark has no reference to officers of the law armed with process.

There is no explicit allegation that she does not allow complainant

to take his conveyances over the turnpike. The contrary is to be inferred from the language used, and is established by the record. The *gravamen* of the averments are that she is owner of the Point and park, as well as turnpike, and that the use she makes of the park and Point is a discrimination in favor of one concern traveling the pike and against another. Her turnpike is authorized by legislative authority and is a public road, on which discriminations could not be tolerated. But because the owner of the pike may have other property under a totally distinct title from that of the pike, and of a different character, and applied to and appropriated for a different use, there is nothing in law or equity which compels the owner to subordinate the uses of the one to the purposes of the other. They are held as independently as though the title to each were in different persons. The law—the courts—cannot control the operations of private business. In a free government the people must be left to the control of their own business. Competition must be allowed, union and co-operations of interests must be permitted, so long as the law is not violated or private injuries done.

Complainant has engaged in a business in which he serves the public. He charges, as we will suppose, one customer three dollars for the use of a carriage and team, and another five dollars, and another still nothing for precisely the same service. Is there any law that will authorize the courts to control his action in thus discriminating? The pleadings show that another turnpike, St. Elmo, runs up Lookout mountain, (which may be traveled as well as respondent's in reaching the Point,) and yet complainant tells us in his bill that he is willing to carry all his vehicles and horses over respondent's pike if she will admit his passengers to the Point. Now, what rule of law or equity would allow complainant to discriminate against St. Elmo pike and in favor of respondent's, when it becomes his interest to do so, and yet not allow respondent to discriminate against complainant and in favor of Owen & Co. in the way of admission to the park and Point when she may think it to her interest to do so?

It is said that the state has imposed a tax on public parks, and that this is a legislative act, declaring the character and use of the park to be public. The taxation of the park indicates rather that the state considers it private property. It is not usual that public property, or property set apart for public uses, is taxed, and it does not seem that the imposition of the burden of a tax on the property should be construed as setting apart the property to public use. It would be strange if a citizen of the state were required by the state to pay a tax for the privilege of having his property placed beyond his control. On the contrary, it would seem that this taxation indicates that the state believed that the owner ought to pay a tax for the privilege of using her private property to raise money by charging the people for its use. So far from considering it an appropriation of her property to a public use, by which the public is benefited, and

through which it acquires to it such rights and equities as may be enforced by the courts, it is declared a privilege to allow the public to use it by the payment of a fee for admission thereto, for which the owner should be taxed. The benefit is to the owner and not to the public. Complainant is taxed for the privilege of charging his customers for his services, but that does not make his a public business. There is little question, probably, but that the public necessities may require, under the proper conditions, that private property may be taken for the use of the public for purposes of recreation and pleasure, but the courts cannot undertake so to appropriate and apply it without legislative authority. It follows from the views expressed that the conclusion is that the injunction granted under the original bill, especially with the light thrown upon the case by the subsequent proceedings, ought to be dissolved.

The first amended bill of complainant presents no features so different from the original bill as to demand additional consideration. The last amended bill of the complainant presents a case very different from the theory of the original bill. It has a twofold aspect: *First.* It alleges that respondent's turnpike road was chartered to run from the foot to the summit of Lookout mountain, and that the summit is not at the brow of the mountain, but is near the Point, and that the dirt road from the brow to the Point is a part of the turnpike, and was opened and used as such; that the park fence is built across the road and obstructs it, and is therefore a nuisance, by which complainant suffers irreparable injury. *Second.* It is alleged that if the dirt road is not a part of the turnpike, it was opened by the owners of the lands over which it passed, and dedicated to the public as a public road, and is obstructed as above shown.

The last position is strongly fortified and strengthened, to say the least, by the use of the road for a period of 30 years and more, and by the terms and declarations of deeds executed by the owners of the land for various lots of land bounded by this road. The Point, however, is not part of this road. The road does not quite reach it. If the road were thrown open from end to end to the public, every person might be excluded from the Point by its inclosure, or otherwise. The whole pleadings show that admission to the Point is what is wanted. This road leads to nothing but the Point. There is little or no value in the free and unobstructed use of the road by complainant, unless his passengers can be admitted to the Point after coming to the end of the road. This they cannot do without respondent's consent, and no case is made by which a court would be justified in forcing her assent. This obstruction of the road does not present such an instance of irreparable damage as would authorize the interference of a court of chancery by its injunction.

Miss Whiteside comes and files a bill in the nature of a cross-bill, in the cause, in which she gives a history of the case and recounts the steps taken in it. She asserts her right to the property and to

its absolute control, and asks that Sharp be enjoined from taking his vehicles and passengers into the park and Point.    Substantially, she asks this court to enjoin the injunction of the state court, which could hardly be done.    The disposition made of the injunction under the the original bill destroys the foundation for Miss Whiteside's application anyway, and no injunction will be granted her.

There remains the injunction on Miss Whiteside's cross-bill, filed in the state court.    No action is invoked in regard to it, and therefore no order is made in reference to it.    It appears to be innocent and harmless, anyway.

---

The reasons given by Judge KEY for the distinction taken by him in the text are so clearly and forcibly stated that they call for no further exposition. The question, however, of illegality of contracts in restraint of business is one of such growing interest that it may well claim a more minute and copious discussion than is consistent with the adjudication of a single contested issue, such as that more immediately before us.    Contracts of this class may be ranged under the following heads:

(1) RESTRICTION OF PUBLIC DUTIES.    Wherever a public duty is lawfully accepted or imposed, a contract by the party who should discharge it, to limit its efficiency to a particular class of persons, is invalid.    No one who is bound to perform a public duty to a particular line of customers, clients, or dependants, can, by contract, give a preference to certain persons over others among the persons privileged.    We may illustrate this position by cases in which, when public offices are by the law of the land open to competition, those having the disposal of such offices contract to sell them to particular aspirants.    Aside from the objection that such contracts are void on the ground of corruption, they are void for the reason that they unduly restrict the disposal of public duties which should not be so restricted.[1]    The same reason avoids contracts for the influencing legislatures to pass bills for the benefit of some of the parties contracting.    This is not merely because "lobbying" contracts of this class are against the policy of the law, but it is also because agreements restricting the discharge of a public duty are in themselves invalid.    And the reasons given for the rulings in this relation show that this distinction is generally recognized.    Persons rendering professional services before committees of the legislature may recover compensation for these services from the parties employing them.    It is otherwise, however, when personal influence is used to induce legislators to discriminate between claimants for particular privileges.    "We have no doubt," says SWAYNE, J., in a case in which this question came up before the supreme court, "that in such cases, as under all circumstances, an agreement, express or implied, for purely professional services is valid.    Within this category are included draughting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing agreements, and submitting them orally or in writing to a committee or other proper authority, and other services of like character.    All these things are intended to reach only the reason of those sought to be influenced.    They rest on the same principle of ethics as professional services rendered by a court of justice, and are no more exceptionable.    But such services are separated by a broad line of demarcation from personal solicitation, and the means and appliances

[1] Kingston v. Pierrepont, 1 Vern. 5; Blachford v. Preston, 8 T. R. 89; Card v. Hope, 2 Barn. & C. 661; Thomson v. Thomson, 7 Ves. 470; Waldo v. Martin, 4 Barn. & C. 319; Cardigan v. Page, 6 N. H. 183; Gray v. Hook, 4 N. Y. 449; Hunter v. Nolf, 71 Pa. St. 282; Grant v. McLestey, 8 Ga. 553.

which the correspondence shows were resorted to in this case."[1] These means were not payment of money, but application of social and political influence to obtain undue discrimination in legislation. And the same position has been subsequently repeatedly reaffirmed.[2] And, on the same principle, agreements to induce an executive to prefer particular parties in the distribution of patronage have been held invalid.[3]

(2) AGREEMENTS NOT TO DO BUSINESS OR WORK IN A PARTICULAR PLACE. The policy of law requires labor to be unrestricted; and even were it not so, it might be a serious question whether the enforcement of an agreement to labor permanently and exclusively for a particular person, at his absolute dictation, is not in conflict with that clause of the fourteenth amendment of the constitution of the United States which prohibits involuntary servitude. If an agreement to labor permanently and exclusively for a particular person, without discrimination as to the line of labor, is valid, and can be enforced, then an agreement for life service could be enforced. Aside from this difficulty, however, which will be considered more fully under the next head, the good of society requires that improvident bargains by laborers to work exclusively for certain employers should not, as permanent arrangements, be upheld. Hence, a special engagement to work for a particular employer for a particular time, will be sustained, but not a permanent and exclusive transfer of services.[4] It is true that if a tradesman or a professional man agree, upon selling the good-will of his business, not to interfere with his vendee, this agreement will be sustained by the courts, supposing that the restraint is reasonable.[5] But to be reasonable there must be a limit as to the space over which the exclusion is to operate, and a limit as to the particular kind of labor to be restricted. "When a limit of space is imposed, the public, on the one hand, do not lose altogether the services of the party in the particular trade; he will carry it on in the same way elsewhere; nor within the limited space will they be deprived of the benefits of the trade being carried on, because the party with whom the contract is made will probably, within those limits, exercise it himself. But where a general restriction, limited only as to time, is imposed, the public are altogether losers, for that time, of the services of the individual, and do not derive any benefit in return."[6]

---

[1] Trist v. Child, 21 Wall. 441.

[2] Meguire v. Corwine, 101 U. S. 111; Oscanyon v. Arms Co. 103 U. S. 261; Powers v. Skinner, 34 Vt. 274; Bryan v. Reynolds, 5 Wis. 200; Gill v. Williams, 12 La. Ann. 219.

[3] Wakefield Co. v. Normanton, 44 Law T. (N. S.) 697; Tool Co. v. Norris, 2 Wall. 45; Pingry v. Washburn, 1 Aik. 264.

[4] Collins v. Locke, L. R. 4 App. Cas. 674; Farrer v. Close, L. R. 1 Q. B. 612; Spinning Co. v. Riley, L. R. 6 Eq. 551.

[5] Ronsillon v. Ronsillon, L. R. 14 Ch. Div. 351; Vickery v. Welch, 19 Pick. 523; Taylor v. Blanchard, 13 Allen, 370; Keller v. Taylor, 53 Pa. St. 467.

[6] Wood v. Byrne, 5 Mees. & W. 562.

Since the publication of my book on Contracts, in 1882, there have been several cases affirming the general principle there stated and repeated in this note. Thus, in Smith v. Martin, 80 Ind. 260, it was held that an agreement by a milkman not to sell milk at a particular town was good as to sales in such town, but did not prevent him from selling milk at his farm, out of town. In Jacoby v. Whitmore, (July,

1883,) reported in 49 Law T. (N. S.) 335, it was held that an agreement by a person employed by another not to carry on a business such as that of the employment at any time thereafter within a certain area, is, in the absence of a specific covenant or stipulation to the contrary, to be understood to continue during the whole of the employe's life-time, notwithstanding the employe has removed his business to another place, and assigned it to a third person. The defendant, the suit being for an injunction, on entering upon an employment as shopman to C., an Italian warehouseman, agreed with C. (there being no mention of assigns) not to carry on a similar business within a mile of C.'s then shop. C. afterwards moved his business to other premises, 450 yards distant, the defendant continuing with him as shopman. The defendant gave up his situation shortly after his removal, and then, some additional time elapsing, C. sold his interest and good-will in the business to J. It was held (BRETT, M. R., and COTTON and BOWEN, JJ., reversing BACON, V. C.) that the defendant should be enjoined, on

(3) Agreements to Labor Exclusively for Particular Persons. In cases of this class two conflicting principles are to be reconciled. One of these principles is that no agreement is to be sustained when the effect of it would be to draw permanently and absolutely from the market any specific quota of labor by which the market would be improved. The other is that freedom of contract should not be impaired. These two principles are reconciled, in the relation here noticed, by the position that freedom to contract to withdraw from labor is to be sustained in all cases in which the withdrawal is limited to a particular place and to a particular line of business. The same distinction is applicable to agreements by parties to deal exclusively with each other in particular lines of business. The law of partnership assumes that such an agreement, when either for a limited time, or when dissoluble at the will of the parties, is promotive of the public good as well as of the good of those immediately concerned; and hence partnership articles, when so conditioned, have been sustained in all jurisprudences. Still more marked illustrations of the principle before us are to be found in the well-known English rulings in which it is held not to be against the policy of the law for a purchaser or lessee of land from a brewer to covenant that in case he opens a public house he will buy all his beer from such brewer.[1] It has even been held that a contract by an author to write exclusively for a particular publisher will be sustained;[2] though this must be on the supposition that the contract is reasonable, and does not put the author in a position in which his productive powers would be limited, or his services secured on an inadequate remuneration. And in *McCaull* v. *Benham*,[3] which was an application for an injunction to prevent an opera singer from violating an agreement to sing exclusively for the plaintiff, Brown, J. said: "Contracts for the services of artists or authors of special merit are personal and peculiar; and when they contain negative covenants, which are essential parts of

the application of J., from setting up a similar business at a spot within a mile from both of C.'s places of business. "Apart," said Bowen, L. J., "from the question as to restraint of trade, a man may bargain as he chooses. Sometimes it is said that contracts as to personal service cease with the employment; but there is no doubt that a man may bind himself by a contract with a master so long as he is in trade; otherwise it could be said that the contract was that Cheek was only to have the benefit of it so long as he carried on business. The assigns are not mentioned in this agreement, but, reading it in the plainest way, it is that Whitmore (the defendant) was at no time thereafter to carry on business within a certain distance of this shop. Then how does the doctrine as to restraint of trade prevent that construction? If that construction would show that the contract was unreasonable, as being in restraint of trade, the agreement should not be so read. The only way other cases affect the point is that, if being construed in a particular way, the contract would be in restraint of trade, that construction should not be put upon it. What is restraint of trade? All contracts in restraint of trade are not void,—that is conclusively settled on the authority of cases in the exchequer chamber and other courts. It is not against

public policy for a person entering an employment to enter into a covenant, restricted as to space, not to carry on the same business on his own account, even if his employer should leave the business. The employer wishes to have security given to the business not only while he is carrying it on himself, but in favor of his successors, and during the whole life of the covenantor; and, if reasonable when made, subsequent circumstances do not affect the operation of the contract under the rule as to contracts in restraint of trade. Therefore, the obvious reading of this contract does not make it unreasonable. Then is such a contract assignable? If it is for all time, it may, of course, be enforced after Cheek (the employer) has left the business. Another question is, whether the benefit of the contract was assigned or not. I think it was. It is part of the beneficial interest, and it is part of the good-will. It is said that the agreement did not bring customers to the shop, but it prevented them from being taken away."

[1] Cooper v. Twibill, 3 Camp. 286n; Gale v. Reed, 8 East, 80; Catt v. Tourle, L. R. 4 Ch. 654.

[2] Morris v. Colman, 18 Ves. 437.

[3] 16 Fed. Rep. 37, (U. S. Cir. Ct. N. Y. 1883.)

the agreement, as in this case, that the artist will not perform elewhere, and the damages, in case of violation, are incapable of definite measurement, they are to be observed in good faith and specially enforced in equity." To this effect are cited *Howard* v. *Hopkyns*,[1] *Fox* v. *Scard*,[2] *Jones* v. *Heavens*,[3] *Barnes* v. *McAllister*,[4] *Nessie* v. *Reese*,[5] *Trener* v. *Jackson*.[6] Contracts, therefore, by which a particular artist is bound to give his services for a specified season to a particular manager are valid and will be enforced, the reason being that the artist is not bound to render his services to all applicants indiscriminately, and that these services are in a special voluntary line. The same rule applies to contracts with physicians; though there can be no question that if a hospital or dispensary should be chartered for the express purpose of affording relief to all patients without discrimination, contracts made by it to confine its benefits to a particular line of applicants would be held invalid. But in any view contracts of this class will not, if oppressive, be enforced in equity. Thus, in a Pennsylvania case,[7] the evidence was that Keeler agreed to instruct Taylor in the art of making platform scales, and to employ him in that business. Taylor engaged to pay Keeler, or his legal representative, $50 for each and every scale he should thereafter make for any other person than Keeler, or which should be made by imparting his information to others. This was held to be an unreasonable restriction upon Taylor's labor, and therefore void as in restraint of trade and legitimate competition. The case being an application to a court of equity to enforce a bargain, it was held that, though "contracts for partial restraints may be good at law, equity is loath even then to enforce them, and will not do so if the terms be at all hard or even complex." It was added that, if it were not void, however, a chancellor would regard the hardships of the bargain, and the prejudice to the public, and would withhold his hand from enforcing it."

(4) Agreements Only to Produce or Labor for a Particular Market. An interesting distinction is here to be observed. It may be that a party owning particular staples, or having the control of labor to any large amount, is under no duty to offer these staples or labor to the community at large. If this is the case, agreements made by him, on a sufficient consideration, to give these staples or this labor exclusively to particular persons are valid. It is otherwise when the agreement is to give a monopoly to a particular party of a commodity which should be open to purchase to the community at large.[8]

(5) Agreements by a Common Carrier to Discriminate against Particular Parties Entitled to be Accepted as Customers. A common carrier is bound to afford equal facilities to all customers paying him a reasonable fare. A recent illustration of this rule is to be found in *Wells* v. *Oregon R. R.*[9] In this case, which was a bill in equity before Field, J., asking for an injunction, the plaintiff claimed to be a corporation under the laws of Colorado, engaged in the express business on the Pacific coast. The defendants were corporations under the laws of Oregon, owning steam-vessels on the Pacific waters and tributaries, and railroads on the Pacific coast. The plaintiff's business was that of a carrier of parcels under the direct supervision of agents accompanying them from the office of the owner or shipper, and delivering them at the office of the consignee. The plaintiffs, in other words, were express agents; the defendants proprietors of a steam-boat and railroad line; and the question presented, to adopt the language of Field, J.,

[1] 2 Atk. 371.
[2] 33 Beav. 321.
[3] 4 Ch. Div. 636.
[4] 18 How. Pr. 534.
[5] 29 How. Pr. 382.

[6] 46 How. Pr. 389.
[7] Keeler v. Taylor, 53 Pa. St. 468.
[8] See Whart. Cont. § 442.
[9] 18 Fed. Rep. 518.

was: "Shall the railway companies and steam-ship companies engaged in that trade be required to furnish facilities to the express companies in the transaction of this business? The business would entirely fail, and come to an end, if certain facilities for its transaction were not afforded them, such as allowing to them special cars or apartments, or definite spaces in them, for the transportation of such articles, with a messenger in charge thereof, having sufficient room for the assortment of the articles by him while in transit, so as to facilitate their delivery at the different stations to which they may be destined. It may be difficult to define with accuracy what should be deemed proper facilities in each case. That will depend very much upon the extent of the business, and the character of the articles carried by the express companies. In the present cases it is not necessary to designate what those facilities should be. The object of the two suits is to restrain the defendants from denying to the plaintiff the facilities which have heretofore been furnished to it." He proceeds to say: "The question is one of much difficulty, and its correct solution will be far-reaching in its consequences. It has been before different circuit courts of the United States in some cases, but has never been brought before the supreme court. In the case of *Southern Exp. Co.* v. *St. Louis, I. M. & S. R. Co.*, in the eighth circuit, it was considered by Mr. Justice MILLER of that court, sitting with Judge McCRARY in holding the circuit court. 10 FED. REP. 210. The railroad company in that case was enjoined by them from refusing or withholding the usual express facilities from the plaintiff. In giving his conclusions, Mr Justice MILLER, among other things, held that the express business is a branch of the carrying trade, which, by the necessities of commerce and the usages of persons engaged in transportation, has become known and recognized so as to require the court to take notice of it as distinct from the transportation of the large mass of freight usually carried on steam-boats and railroads; that the object of this express business is to carry small and valuable packages rapidly, in such manner as not to subject them to the danger of loss and damage, which, to a greater or less degree, attend the transportation of heavy or bulky articles of commerce; that it is one of the necessities of this business that the packages should be in the immediate charge of an agent or messenger of the company, or parties engaged in it, without any right on the part of the railway company to open and inspect them; that it is the duty of every railroad company to provide such conveyance, by special car or otherwise, attached to their freight or passenger trains, as are required for the safe and proper transportation of this express matter on their roads; that the use of these facilities should be extended on equal terms to all who are actually engaged in the express business, at fair and reasonable rates of compensation, to be determined by the court when the parties cannot agree thereon; and that a court of equity has authority to compel the railroad companies to carry this express matter, and to perform the duties in that respect. The same question has been decided substantially in the same way in other cases. From the decisions rendered in some of them, appeals have been taken to the supreme court, and the cases are now on its calendar. Under these circumstances I have come to the conclusion to follow the view expressed in them, rather than to go into an extended consideration of the question. The following cases are now pending in the supreme court: *Memphis & L. R. R. Co.* v. *Southern Exp. Co.*, *St. Louis, I. M. & S. R. Co.* v. *Southern Exp. Co.*, and *Missouri, K. & T. R. Co.* v. *Dinsmore, President of Adams Express Company.* In their determination the question presented will be definitely and authoritatively settled."

For the reasons above given, the supreme court of Connecticut held invalid a contract by which the Hartford & New Haven Railroad agreed to deliver to the New York & New Haven Railroad at New Haven all passengers by

its line for New York; and the New York & New Haven Railroad was to prevent the construction of a railroad which would be a rival and a competitor of the Hartford & New Haven Railroad. This was declared by the court to be a contract void as against public policy.[1]

It has been held in New York[2] that a contract precluding one of the contracting railroads from building branches was void as an infringement of the rights of travel. The court says: "It is a compact between the parties intended to affect the facilities for public travel over a route of railroad which had been or might be authorized by law. * * * Such an arrangement was intended to prevent the extension of the New Haven & Northampton Railroad to any point north of its terminus at Granby, and to prevent any competition in travel detrimental to the interests of plaintiff's road, which had a monopoly of the carrying trade from Springfield, and points north of Springfield, via the Northampton & Springfield Railroad, which such extension might affect. The completion of the New Haven & Northampton Railroad to Northampton would open a new line for travel southward, which would be a competitive rival of the road of the plaintiffs. Such competition and rivalry it was not lawful for these parties to prevent, or attempt to prevent, and any contract to effectuate such a purpose is void. Public policy is opposed to any infringement of the rights of travel, or of any of the facilities which competition may furnish; and the law will not uphold any agreement which does or may injuriously affect such rights or facilities;" citing *Doolin* v. *Ward*,[3] *Hooker* v. *Vandewater*,[4] and *Hood* v. *N. Y. & N. H. R. R.*[5]

In *Hooker* v. *Vandewater*[6] the proprietors of five several lines of boats, engaged in the business of transporting persons and freights on the Erie and Oswego canals, entered into an agreement among themselves to run for the remainder of the season for certain rates of freight and passage, then agreed upon, and to divide the net earnings among themselves, according to certain proportions fixed in the articles. This agreement was declared illegal. "It is a familiar maxim," said the court, "that competition is the life of trade. It follows that whatever destroys or even relaxes competition in trade is injurious, if not fatal, to it."

In *Denver R. R.* v. *Atchison, Topeka, etc., R. R.*,[7] it was held by the circuit court for Colorado that a contract between two railroad corporations, by which they agreed to exchange their traffic, and not to "connect with or take business from or give business to any railroad" which might be constructed in Colorado or New Mexico after the date of the agreement, is void as against public policy. This ruling is sustained by an instructive note by Mr. Adelbert Hamilton, citing *Charlton* v. *R. R.*,[8] *Salt Co.* v. *Guthrie*,[9] *Central R. R.* v. *Collins*;[10] though it is admitted that the point is decided differently in *Hare* v. *R. R.*,[11] *Southsee Co.* v. *London R. R.*,[12] and *Eclipse Co.* v. *R. R.*[13]

In *Twells* v. *Penn. R. R.*[14] it was decided by the supreme court of Pennsylvania in 1863, that, though A., a railroad company, may have power to discriminate between "local" and other freights, it cannot make such a discrimination on the ground that the freight discriminated against is to be carried to its place of final delivery by another company after reaching the terminus of A.'s route. "The defendants," said STRONG, J., (afterwards a judge

[1] State v. Hartford & N. H. R. Co. 29 Conn. 538.
[2] Hartford R. R. v. N. Y. & N. H. R. R. 3 Rob. 411.
[3] 6 Johns. 194.
[4] 4 Denio, 349; 29 Conn. 538.
[5] 22 Conn. 502.
[6] 4 Denio, 349.
[7] 15 Fed. Rep. 650.
[8] 5 Jur. (N. S.) 1100.
[9] 35 Ohio St. 672.
[10] 40 Ga. 582.
[11] 2 Johns. & H. 80.
[12] 2 Nev. & Man. 341.
[13] 24 La. Ann. 1.
[14] 12 Amer. Law Reg. (O. S.) 728; 3 Amer. Law Reg. (N. S.) 728; 21 Leg. Int. 180.

of the supreme court of the United States,) giving the opinion of the supreme court of Pennsylvania, "are authorized by their charter to be common carriers on their railroad from Pittsburgh to Philadelphia, with power to establish, demand, and receive such rates of toll, or other compensation, for the transportation of merchandise and commodities as to the president and directors shall seem reasonable. It is admitted that, in the exercise of these powers, they must treat all customers alike. Now, it is clear that if they receive coal oil at Pittsburgh to be carried to Philadelphia, it can make no difference to them, either in the risk or cost of transportation, whether Philadelphia is the point of ultimate destination of the oil, or whether the consignee intends that it shall afterwards be started anew on another line, and forwarded from Philadelphia to New York. The point of final destination of the freight is a matter in which they have no interest as carriers over their own road. If it be admitted that they may contract to carry freight to points beyond Philadelphia or Pittsburgh, over connecting lines, it is still true that as to all carriage beyond the *termini* of their own road they stand in the position of third parties, and they can no more secure to themselves an advantage over other carriers on the connecting lines by discriminating in tolls on their own, than they could secure similar advantages to one shipper over another in the same way; yet this is the practical effect of the regulation which the defendants are seeking to enforce against the complainant, and we cannot doubt that such is their object in making it. They in reality say to him: 'Employ us to carry your oil, not only over our road to Philadelphia, but thence to New York. If you do not, we will exact from you for its carriage to Philadelphia six cents per hundred pounds more than we demand from all others who employ us to transport similar freight only to Philadelphia. ' Or, if you employ us to carry it to New York after it shall have reached Philadelphia, we will carry it to Philadelphia for six cents less per hundred pounds than we are accustomed to charge others for similar transportion.' No one will maintain that they can lawfully make such a stipulation for the benefit of a third party, *e. g.*, one of two other carriers. They cannot say to a shipper at Pittsburgh, of any domestic product, 'You have freight destined to New York. You must send it over our road to Philadelphia. If, when it arrives there, you will forward it by A. to New York, we will carry it over our line at certain rates. If you send it by any other than A. our charges will be higher.' This is a discrimination that cannot be allowed. Conceding it, would put in the power of the defendants a monopoly of the carriage of all articles which pass over their road from either terminus to every place of final delivery. The oppressive effects of such a rule are the same, whether its motive be to benefit third parties, or the railroad company itself. Of transportation along the line of their road the defendants practically have a monopoly. It is not consistent with the public interests, or with the common right, that they should be permitted so to use it as to secure to themselves superior and exclusive advantages on other lines of transportation beyond the ends of their road. If they contract to carry freight to distant points in other states and countries, they should stand on the same footing with other carriers, over other roads and lines than their own. If they may use their exclusive powers over their road so as to force into their own hands all external carrying trade, and do this at the expense of a shipper or class of shippers, it is quite possible for them to exclude one domestic product from all foreign markets. Shippers of such products might be compelled to seek a final market in Philadelphia, under penalty of such increased rates of toll beyond as to make it impossible for them to find any other place of sale. These consequences, more or less aggravated, according to the will of the defendants, and according to interests

they may have distinct from those which belong to them as owners of their road, flow naturally from permitting the destination or use to be made of freight, after it has left the road, to affect the price of carriage over it.

"In *Baxendale* v. *Great Western R. Co.* (14 C. B. N. S. 1; 16 C. B. N. S. 137) it was held that the company could not secure to themselves a monopoly of the delivery of goods beyond the termination of their road by a general regulation charging a gross price for carriage on the road, including the cost of such delivery, to all persons, whether they receive their goods at the station or beyond. In other words, they were not allowed to make use of their rights over their road to secure to themselves advantages beyond it. That there are special privileges to individuals or classes of men, makes no difference, for they are but declaratory of the common law. *Sanford* v. *Catawissa R. Co.* 12 Harris, 378. We hold, then, that the rule of the defendants, of which the complainant complains, is unreasonable, and such as they have no legal right to enforce. The apology set up for it is not sufficient. That the imposition of higher rates for carrying the complainant's oil to Philadelphia, because it is afterwards to be forwarded in some way to New York, is necessary to prevent his having an advantage in the New York market over those who employ the defendants to transport all the way, or over those who send oil from Pittsburgh to New York with through bills of lading, is a matter outside of their control. It has no proper relation to them as carriers."

Two points are worthy of notice in reference to this remarkable case. The first is that, though reported in two current Philadelphia periodicals, above noticed, it is not to be found in the regular Pennsylvania reports. The second point is that at the same term of the supreme court of Pennsylvania was decided, Judge STRONG also giving his opinion, the case of *Shipper* v. *Pennsylvania R. R.*, (reported in 47 Pa. St. 338,) in which it was held that the Pennsylvania Railroad Company had a right, under its charter, to charge a higher freight on goods coming to it from beyond the state than it had for freight delivered to it in the state. "There is nothing," so Judge STRONG closes his opinion, "in the constitution of the United States that prohibits a discrimination between local freight and that which is extraterritorial, when it commences its transit. Such a discrimination denies to no citizen of another state any privilege or immunity which it does not deny to our own citizens."

On the same reasoning it has been held that an agreement whereby a railroad corporation grants to a telegraph company the exclusive right to put on the railroad track a telegraph line, cannot be sustained. The reasons given are twofold: *First*, such a monopoly cripples competition, and is therefore in restraint of trade; *secondly*, telegraph companies are by act of congress authorized to operate telegraph lines on all roads used as post-roads.[1] On the question of the right of a railroad corporation to give the exclusive use of its track to a particular telegraph company, the supreme court of Illinois says: "The objection to the contract on the ground of public policy is that it gives to the appellant, the Western Union Telegraph Company, the monopoly of the telegraph business along the line of the railroad. However it may be as to the provision of the contract in this respect, taking in its full extent of an exclusive right of way and the discouragement of competition, *in so far as it goes only to the exclusion of competitors from the line of poles occupied by a complainant, when direct injury to the actual working of complainant's line of wire might result,* it is, in our view, not liable to this objection. So long as any other company is left free to erect another line of poles, we see no just ground of complaint on the score of monopoly

---

[1] Western U. Tel. Co. v. Burlington R. R. 11 Fed. Rep. 1; Pensacola Tel. Co. v. Western U. Co. 96 U. S. 1. See Atlanta Tel. Co. v. Railroad, 1 McCrary, 541; Western U. Tel. Co. v. Railroad, Id. 565.

or the repression of competition." *Western U. Tel. Co.* v. *Chicago & P. R. R.* and *Atlantic & P. Tel. Co.* 86 Ill. 246.

In *Western U. Tel. Co.* v. *Atlantic, etc., Tel. Co.*, in the court of common pleas of Columbus, Ohio, Judge GREEN gave an opinion from which the following extracts are taken: "This contract embraces other provisions which, as it is alleged, the defendants propose to interfere with. It will be observed that it is not averred in the petition that the defendants propose to remove any but the one wire,—the railroad wire,—nor to prevent the plaintiff from using or continue to use, for the transaction of its business as a telegraph company, the other wires on the poles erected under the contract. The complaint is that the railroad company proposes to violate a term or covenant of the contract by permitting a competing line of telegraph to be erected on its right of way by a rival company, by which its profits will be greatly diminished. The covenant referred to will be found in the sixth clause of the contract, and is in these words: 'The railroad company is not to permit any other telegraph company or individual to build or operate a line of telegraph along its road or any part thereof.' The clause of this contract now under consideration, if it shall receive the construction claimed by the plaintiff, is, in my opinion, against public policy.

"In the case of *St. Joseph & D. C. R. Co.* v. *Ryan*, reported in 11 Kan. 602, a railroad company, in consideration of a grant of a right of way through certain lands, agreed with the owners to erect and maintain a depot upon said lands, and not to have any other within three miles thereof. It was held that the contract was against public policy. See, also, 24 Pa. St. 378. The public have a deep interest in the operation and establishment of lines of telegraphic communication; it would be inequitable that the rights of the community should be sacrificed to insure the alleged privileges of the plaintiff from all possible damages. In view of the facts of the case, showing that these corporations are not the only parties interested in the contract, and that the public at large have a deep interest in it, it would in my opinion be an unwarrantable exercise of power in a court of chancery to grant an injunction." This case, so it was stated in the argument in *Western U. Tel. Co.* v. *Baltimore & O. R. Co.*, was decided in 1876, and a competing line of telegraph has been operated upon the Central Ohio Railroad ever since.

In *Western U. Tel. Co.* v. *Union Pacific R. R.*,[1] Judge MILLER thus speaks: "It was one of the provisions of this contract that the railroad company should not send over its wire any commercial messages, or any paid messages, or messages for any other person than for its own business, the purposes of which evidently was to leave the exclusive right to convey such messages to the telegraph company. And it was to enforce this clause of the contract that the injunction was obtained by the Western Union Telegraph Company in the state court. And it is to get rid of this provision and permit the railroad company to convey such messages, and to unite the wires of the telegraph company with the American Union Telegraph Company that messages may be conveyed brought by the American Union Telegraph Company over the wires of the Western Union Telegraph Company, that the present motion is made. * * * We are both [McCRARY and MILLER, JJ,] of opinion that the railroad company has the right, as it always had, to the exclusive use of the first wire on the telegraph poles, and we are of the opinion that, as the matter stands at this stage of the proceedings, that company should have the right, pending the further litigation of the case, to use that wire, not only for the ordinary business of the road, but for the purpose of transmitting commercial and paid messages for the public in general."

[1] McCrary, 585, 597; [S. C. 3 Fed. Rep. 725, 734.]

(6) WHEN THERE IS NO PUBLIC DUTY THEN THERE MAY BE DISCRIMINATION. The distinction between the cases rests on the question of public duty. When a party is bound to perform a public duty without discrimination, then an agreement to give preferences to particular persons is invalid. When, however, as in the case in the text, there is no such duty, then there may be a discrimination for the reasons given with much ability by Judge KEY. Had the defendant, Miss Whitesides, been under any public duty to permit no discrimination in the reception of persons visiting her estate, then a contract by her to admit only such persons as should come in a particular line of travel would be invalid. This would unquestionably be the case did she undertake to receive guests as at a public inn; since, as is pointed out by Mr. Justice BRADLEY in his opinions in the civil rights questions,[1] the proprietor of an inn or a hotel is not permitted to discriminate arbitrarily between different classes of guests. But Miss Whitesides was not in this position. A visit to her estate was not a necessity, as is the case with the accommodations obtained by travelers from hotel or common carrier. The visit was a matter of luxury, and on the enjoyment of this luxury she was entitled to impose whatever restrictions she chose. It is true that the line between the two classes of cases may sometimes be shadowy. When, however, we apply the criterion of public duty, the two classes of cases become readily distinguishable. We have this illustrated in some recent rulings as to contracts by which certain telephone companies agree to deal exclusively with certain telegraph companies. In Connecticut such a contract has been held to be valid.[2] On the other hand, a similar contract has been held to be invalid in Ohio; and the reason of this ruling may be found in the fact that in Ohio a statute exists prescribing the impartial transmission of all dispatches. A similar statute no doubt exists in Connecticut; but it was not regarded by the court as binding the telephone company. But, whatever we may think of this distinction, we may regard it as settled that the only cases in which a party is prevented from discriminating between persons seeking to do business with him are the following: (1) Where he has the monopoly of some staple whose use is essential to the community: (2) Where, as is the case with common carriers and innkeepers, he is required by law to place all applicants, not subject to exclusion on police grounds, on the same footing.

FRANCIS WHARTON.

[1] 3 Sup. Ct. Rep. 18.

[2] Amer. Rapid Tel. Co. v. Telephone Co. 13 Reporter, 329.