THE WESTERN UNION TELEGRAPH COMPANY

*v.*

THE CHICAGO AND PADUCAH RAILROAD COMPANY *et al.*

1. CONTRACT — *binding by acceptance without signing.* Where a contract between a railway company and a telegraph company, in respect to furnishing and operating a telegraph along the railroad, was reduced to writing and signed by the telegraph company, and a copy thereof sent to the railway company, which, by letter of its agent, was accepted, except as to one matter which was acceded to by the former company, and under this arrangement the telegraph company made large expenditures, and each of the companies, for a long time, acted upon the terms of the contract, it was *held,* that, by the acts of acquiescence, adoption, and recognition by the railway company of the terms of the contract, it was binding on the latter, although such company did not formally execute the same.

2. SAME — *exclusive right, whether against public policy.* A contract between a railway company and a telegraph company, whereby each was to contribute, in certain respects, in establishing a telegraphic line along the railroad, and the telegraph company was to operate the same, when completed, on certain terms, and in which the railway company agreed to give the telegraph company the exclusive right of way for telegraphic purposes, so far as it legally might, and to discourage competition, was *held,* not to be contrary to public policy as creating a monopoly in giving the exclusive right of way and discouraging competition, so far as it went to the exclusion of competitors from the line of poles occupied by the telegraph company, and that under such contract, if the railway company authorized any other telegraph company to put up another line of wire upon the same poles, a court of equity would enjoin the placing and maintaining of a wire upon such poles.

3. STATUTE OF FRAUDS — *what a sufficient signing.* A contract between a railway company and a telegraph company, to continue for twenty-five years, was signed by the telegraph company, and the agent of the railway company wrote a letter accepting the same as prepared, except as to a certain matter, which the telegraph company acceded to. The railway company never formally signed the written contract. It was *held,* that the letter of acceptance of the contract by the agent was a sufficient signing within the statute of frauds, and when the terms of the contract were mutually executed for over a year by each party, it was further *held,* that the contract was taken out of the statute of frauds by part performance.

APPEAL from the Circuit Court of LaSalle County; the Hon. E. S. LELAND, Judge, presiding.

This was a bill in equity brought by the Western Union Telegraph Company against the Chicago and Paducah Rail-

road Company and the Atlantic and Pacific Telegraph Company, for an injunction to restrain the last-named telegraph company from the use, for the line of its wire, of the telegraph poles along the road of the railroad company.

The facts appearing are, that in the winter and spring of 1874, the Chicago and Paducah Railroad Company was constructing and had about completed its railroad from Streator to Altamont. It had commenced the construction of a line of telegraph by the erection of a line of poles for a portion of the distance, when negotiations were opened with the Western Union Telegraph Company looking to the adoption of the telegraph line by that company. These negotiations were carried on mainly by Ralph Plumb, the vice-president and general manager of the railroad company, on one side, and Anson Stager, the general superintendent of the telegraph company, on the other. They resulted in the drawing up of a contract in writing, the formal execution of it by the proper officers of the telegraph company, and the submission of a copy of it to the railroad company. The contract provides as follows: that the railroad company shall furnish and distribute *for* the telegraph company, along the line of the road, cedar poles, and furnish all labor to erect the poles, and to place wires and insulators thereon, and also to furnish the labor to keep the telegraph line in repair; the telegraph company agreeing to furnish wire, insulators, batteries, instruments, and all other material except poles, necessary to the construction of the line, and to furnish all material, including poles, necessary to keep the line in repair. The telegraph company agrees to give the free use of new telegraphic patents, discoveries, or inventions which may be required during the continuance of the contract.

The railroad company grants and agrees to assure to the telegraph company, so far as it legally may, an exclusive right of way along the railroad line and lands for commercial or public telegraph purposes, and to discourage competition by withholding facilities and assistance, performing toward competing lines its legal duty and no more.

The messages of the officers and agents of the railroad

company are to be transmitted over the line free of charge, and the telegraph company agrees, in addition, to transmit such messages over its lines throughout the United States, free of charge to the amount, at regular rates, of $100 per month, and for such messages in excess of that amount at one-half the regular rates.

The telegraph company agrees to furnish machinery and batteries for all offices which the railroad company may deem it necessary to open; and the railroad company agrees to receive at its offices, and transmit, all commercial messages which may be offered, at the tariff rates of the telegraph company, rendering monthly accounts of receipts, and paying the same to the telegraph company, and in all such business conforming to the rules and regulations of the telegraph company.

The telegraph company's operator shall perform telegraph duty for both companies, unless the business of both companies is too large for one operator, in which case each pays its own operator.

It was agreed that the telegraph line or wires covered by the contract should form part of the general telegraph system of the telegraph company, and as such, in the department of commercial or public business, should be controlled and regulated by it, the telegraph company fixing and determining all tariffs for the transmission of messages, and all connections with other lines.

The contract to be in force for twenty-five years from the first day of ———, A. D. 1874.

Immediately upon the submission of the draft or copy of the contract to the railroad company, Stager received the following letter from Plumb, the vice-president and general manager of the railroad company:

" *Chicago and Paducah Railroad Company,*

"*Streator, March 5th, 1874.*

"Anson Stager, Esq., *Gen'l Supt. W. U. Tel. Co.* :

" Dear Sir, — Yours, with draft of contract proposed for telegraph on the line of Chicago and Paducah Railroad, is received, and has been examined.   It is proper to state that

so far as we have already erected poles they are cedar, have insulators now on them, and are 200 feet apart. For the remaining distance we will put them up at the rate of 30 to the mile; while you can furnish the balance of the insulators and allow us cost for those put up by us. With this exception, we accept the terms named in the draft of. the contract furnished, and ask your company to do the same. If this is done we shall require about 1,000 additional poles to build as far as the track is now ready, 143 miles. What about the four-inch poles referred to being on hand in Chicago? We are very anxious to get the 143 miles up at as early a day as possible, and the remaining thirteen miles as soon as the track is laid in May next.

" If you require the contract signed and returned now, we are ready to do it.

"Yours truly,

"RALPH PLUMB, *V. P. and G. M.*"

The telegraph company immediately notified the railroad company of its acceptance of the contract, as requested, fixing the date left blank at January 1, 1874.

The companies respectively furnished the labor and material required by the contract; the telegraph company equipping the line with wire, insulators, batteries, blanks, etc., so that by June, 1874, the line was in working order, and for that month the railroad company made to the telegraph company its first return and payment of receipts for commercial business, and did the same for each succeeding month to July, 1875, inclusive. In August, 1874, a bill for $560, rendered by the Kenosha Insulator Company to the railroad company, for insulators ordered by that company before the contract was made, was sent by the railroad company to the telegraph company and paid by the latter at the request of the railroad company. After the completion of the line, franks for the free telegraphing were applied for and furnished, as provided in the contract; requisitions for telegraph supplies were constantly made by the railroad company upon the telegraph company, and

from June, 1874, to August, 1875, the telegraph business upon the line was conducted in all respects according to the terms of the contract, so far as appears to have been known to the telegraph company. The free business of the railroad beyond the line was performed as agreed.

The formal signature to, and execution of, the contract by the railroad company does not appear. The reason seems to have been this: The contract was lost in the New York office of the telegraph company, and remained there for more than a year. When it was at last discovered, Plumb was absent, and Shumway, the then manager, requested some slight modification, so that the Chicago railroad office might be connected with the line on the railroad, through the telegraph company's wires.

Stager did not accede to the request to change the contract, although it was, as he states, a small matter with the telegraph company, and that he would probably have yielded the privilege voluntarily; and Stager allowed the matter to remain until the return of Plumb from abroad.

In August, 1875, the railroad company gave permission to the Atlantic and Pacific Telegraph Company to string a wire upon the poles along the line of the railroad. This telegraph company entered upon the work of stringing its wire with great rapidity, but before the work was completed, this bill was filed to enjoin such use of the poles. Upon the final hearing the bill was dismissed, and the complainant appealed.

Messrs. Williams & Thompson, for the appellant.

Messrs. Crawford & McConnell, for the appellees.

Mr. Justice Sheldon delivered the opinion of the Court:

The defense set up against the bill is, that the alleged contract was never executed by the railroad company, and is not binding upon it. The statute of frauds is also set up;

and that the contract should not be enforced, as being against public policy.

The draft of contract in the case was not actually signed by the railroad company, and it is contended that Plumb had no authority to make such a contract for the company. This being admitted, still the fact appears that Plumb, the vice-president and general manager of the railroad company, by his letter to the telegraph company, expressly accepted, with one exception, which was acceded to, the terms named in the draft of contract. In reliance upon this as an acceptance of the contract by the railroad company the complainant went on and made large expenditure in the completion of the line of telegraph, the railroad company furnishing the labor and material required by the contract. After the completion of the line, the telegraph business was conducted thereon for a year and more by both parties, and requisitions for telegraph supplies and applications for franks for the free telegraphing were made by the railroad company and furnished by the telegraph company in all respects according to the terms of the contract. All this while there was no dissent or objection whatever by the railroad company to any of the terms of the contract, except at about the end of the time, as to the unimportant particular of the connection of the Chicago railroad office with the line.

The expenditures which the telegraph company was thus induced by the conduct of the railroad company to make in the completion of the line and the subsequent carrying on of operations upon it were not upon the understanding of a revocable license to place their wire upon the poles; but they were upon the terms and conditions of the contract, as securing to the telegraph company rights in respect of the telegraph poles, and carefully guarding them against interference and injury on the part of any other telegraph company. The property of the complainant is upon the line, placed there under those terms and conditions.

The contract named that the poles are to be furnished *for* the telegraph company.

In view of all the acts of acquiescence, and adoption, and recognition by the railroad company. of the terms of the contract, we can have no doubt that they should be held binding upon the company, although it did not formally execute the contract.

And we are of opinion that, under the terms of the contract, appellant's rights in respect of the line of poles in question are exclusive as regards any other telegraph company, so far as physical interference or injury may result from placing upon the poles an additional wire by another company.

As respects the statute of frauds, we regard the acceptance of the contract by the letter of Plumb as a sufficient signing within the statute. *McConnell* v. *Brillhart*, 17 Ill. 354; *Cossitt* v. *Hobbs*, 56 id. 231. Also, that the contract is taken out of the statute by the mutual execution of its terms and provisions, on the principle of part performance.

The objection to the contract on the ground of public policy is, that it gives to the appellant the monopoly of the telegraph business along the line of the railroad company.

However it might be as to the provision of the contract in this respect, taking it in its full extent of an exclusive right of way, and the discouragement of competition, in so far as it goes only to the exclusion of competitors from the line of poles occupied by complainant when direct injury to the actual working of complainant's line of wire might result, it is not, in our view, liable to this objection. So long as any other company is left free to erect another line of poles, we see no just ground of complaint on the score of monopoly, or the repression of competition.

As to the liability of interference with, and injury to, complainant's line of wire from the placing on the poles of an additional line by another company, many experts are examined on both sides, and their testimony upon the subject is very conflicting. A large number of them testify that there is great practical difficulty in working two lines of wire upon the same set of poles when the wires are under the man-

agement of distinct companies, and give their opinion that there would be liability of serious annoyance, inconvenience, and injury to complainant's line of wire from the additional wire on the same poles ; and some of them support their opinion by statement of actual results which have followed in instances named.

We think a case is presented entitling the complainant to the relief prayed, so far as respects the placing and maintaining a wire upon the poles in question by the defendant telegraph company.

That company is fully chargeable with notice of the rights of the complainant. It virtually admits that it was put upon inquiry in regard to them ; stating, in its answer, that it was informed by the railroad company that the line of wire which had been placed upon the poles by the complainant was under a parol understanding in the nature of a revocable license. It should not have stopped with the railroad company in making inquiry. Resort should have been had to the complainant, as the proper source of information in respect to its rights.

The decree will be reversed, and the cause remanded for further proceedings conformable to this opinion.

*Decree reversed.*