Freeport Journal-Standard Publishing Company, Plaintiff-Appellant, v. Frederic W. Ziv Company, Defendant-Appellee.

Gen. No. 10,523.

Opinion filed January 8, 1952.
Released for publication January 28, 1952.

BURRELL & BURRELL, of Freeport, for appellant; R. B. HOLTAN, and DAVID M. BURRELL, both of Freeport, of counsel.

ASCHER & ELLIS, of Freeport, for appellee.

Mr. PRESIDING JUSTICE DOVE delivered the opinion the court.

Appellant, Freeport Journal-Standard Publishing Company, filed a complaint in the circuit court of Stephenson county against appellee, Frederic W. Ziv Company, requesting that its rights and obligations under a certain radio transcription lease be declared. By its complaint it alleged that it was a corporation organized and existing under the laws of the State of Illinois and that the appellee was an Ohio corporation licensed to do business in Illinois; that it (appellant) owned and operated a radio broadcasting station under the call letters of WFJS; that sometime prior to October 14, 1948, at Freeport, Illinois, one Paul E. Sammon affixed his signature to a certain radio transcription lease, a copy of which was made a part of the complaint, and thereafter appellee executed said lease; that appellee never sent to it, or in any other manner placed in its possession sufficient transcriptions to commence the programs described in said transcription lease; that prior to the commencement of this action appellee demanded that appellant carry out the terms of said lease; that appellant has advised appellee that it denies any interest in or liability under said lease and that an actual controversy has arisen between appellant and appellee as to whether or not appellant is, in any manner, legally obligated to perform said

339

lease. The appellant prayed that the court declare that the said radio transcription lease neither imposed any obligations upon appellant nor gave it any rights thereunder.

By its answer, as amended, defendant admitted the lease and averred that appellant was the owner and operator of Radio Station WFJS; that WFJS is not a separate corporate entity but is the name under which appellant operates its radio broadcasting business; that said Paul E. Sammon was the commercial manager of WFJS and was authorized and empowered to sign the lease in question on behalf of appellant; that he did sign said lease and that said lease is a corporate instrument of appellant and that said Paul E. Sammon was its duly authorized agent and was duly authorized to execute said lease on its behalf.

Appellee also filed a counterclaim alleging the execution of the transcription lease by appellant through its duly authorized agent, Paul E. Sammon and averred that appellant had breached said agreement and had refused to perform any of its obligations and, therefore, appellee demanded judgment against appellant for $7,800 for its refusal to comply with said lease.

The radio transcription lease out of which this controversy arises, so far as relevant to the issues presented by the pleadings, is as follows:

## "RADIO TRANSCRIPTION LEASE

"This lease, made this fourteenth day of October, 1948, by and between Frederic W. Ziv Company, hereinafter referred to as the lessor, and Radio Station WFJS, 217 West Exchange St. Freeport, Ill. hereinafter referred to as the lessee, witnesses:

"That the lessor has hereby leased to the lessee, for broadcasting for such purposes only, the electrical transcriptions hereinafter designated:

340

260 Freddy Martin Programs (5 per week) ¼ hr
260 Boston Blackie Programs (5 per week) ½ hr
104 Lightning Jim Programs (2 per week) ½ hr
 52 Guy Lombardo Programs (1 per week) ½ hr
260 Old Corral Programs (5 per week) ¼ hr
260 One for the Book Programs (5 per week) 5 min
260 Calling All Girls (5 per week) ¼ hr
 52 Parents Magazine (1 per week) ¼ hr

"That . . . the aforesaid electrical transcriptions shall be broadcast each week beginning January 2, 1949.

"That none of said electrical transcriptions shall be broadcast by or on behalf of the lessee more than once or over more than one broadcasting station.

"That the lessee hereby agrees to pay to the lessor for all of said electrical transcriptions the sum of $150 per week for the number of electrical transcriptions contracted to be used in that month during the term of this lease.

"If the lessee be at any time in default in the payment hereunder, the lessor shall be wholly relieved from providing transcriptions hereunder, and lessor may at its option declare the total unpaid rental for the remainder of the term of this contract immediately due and payable, and damages for the breach of contract shall be the full rental stipulated in the contract.

"That the transcriptions leased hereby shall be broadcast by Station WFJS—FM of 215 West Exchange St., Freeport, Ill. and by said Station only.

"That the lessor may ship said transcriptions direct to said Station.

"Witness the hands of the parties to this lease hereunto set the day and year first above written.

"WFJS, Commercial Manager, Lessee
Address 215 W. Exchange St., Freeport, Ill.
by Paul E. Sammon
Commercial Manager
"Frederic W. Ziv Company
1529 Madison Road
Cincinnati 6, Ohio
By Frederic W. Ziv

"This agreement is not binding until accepted by a duly authorized agent of Frederic W. Ziv Company at the home office, Cincinnati, Ohio."

The case was tried before the court. At the conclusion thereof a judgment order was entered finding that the aforesaid transcription lease was in fact and in law the contract of appellant and the relief prayed for in the complaint was therefore denied and judgment was entered in favor of counterclaimant on its counterclaim. and against the plaintiff for $7,800. To reverse this judgment the plaintiff appeals.

Appellant insists that the transcription lease is not a corporate document for the reason that nowhere in said lease is the name of appellant used or referred to, but that even if it should be held to be a corporate document, it is not binding on appellant for the reason that Paul E. Sammon, who purported to execute the lease, had no authority, express, implied or apparent, to sign the same on behalf of appellant. Appellee contends that the transcription lease is the instrument of appellant; that Paul E. Sammon had apparent authority to execute said lease on behalf of appellant and in any event appellant has, by its conduct, ratified said lease and is therefore estopped to question its validity.

The record discloses that appellant is engaged in publishing a newspaper and operating a radio station

in Freeport. The radio station is not a separate corporate entity and is known and licensed under the call letters of WFJS. Appellee's principal business is the production and distribution of transcribed radio programs which it leases to radio stations for broadcasting purposes. Donald Breed is the president and principal stockholder of appellant. John D. Holmes was the general manager of Station WFJS on October 14, 1948, when the transcription lease involved here was executed. He is a radio man of extensive experience, having been in some phase of that business since 1926. He came to Station WFJS in 1946 and became station manager in August of 1948, replacing a man by the name of Cunningham. Paul E. Sammon held the position of "commercial manager" of WFJS, and Holmes was his immediate superior, and Holmes' superior was Mr. Breed. Sammon had been commercial manager for a few months, having succeeded a man by the name of Fenz in that capacity. During the early summer of 1948, Fenz, the then commercial manager of WFJS, wrote to appellee for information concerning its programs and asking for some discs for audition purposes. Fenz's letter, written on the letterhead of appellant, was signed by him as commercial manager. On October 1, 1948, Sammon, who had then succeeded Fenz as commercial manager, also wrote to appellee stating that he was interested in purchasing some of appellee's programs and asking for the prices of the same.

In response to the inquiries of Fenz and Sammon, a sales agent of appellee, Barney Goldman, came to Freeport on October 14, 1948, and contacted Mr. Sammon at the office of the radio station. Negotiations between Sammon and Goldman culminated in the controverted transcription lease. Under the terms of the lease, as originally proposed by Goldman, the rental charge was to be $206 per week, but Sammon informed Goldman that he was limited by a budget of $150 per

week and this figure was finally agreed to by Goldman. Sammon typed the lease in quadruplicate upon a form furnished by Goldman, and Sammon then signed it as hereinabove set forth. Goldman returned the agreement to his home office, where appellee executed it and returned a copy to Sammon.

Immediately after he signed the lease, Sammon advised Holmes about its execution. Holmes told Sammon that he "shouldn't have done that" and that "he had better get out of it." The starting program material under this lease was shipped by appellee on October 27, 1948. Appellee shipped sufficient materials for two broadcasts of each of the eight programs covered by the lease, together with promotional kits and supplies designed to assist radio stations in selling, preparing and presenting the shows covered by the lease. This was enough material to permit the commencement of the broadcasting of the various programs covered by the contract.

Holmes testified that Sammon had no authority to execute the lease, but he did nothing toward advising appellee of his position in this respect, nor did he communicate with appellee concerning the same until several months later, nor was the material returned or paid for. There was evidence from Holmes that Sammon had made another purchase of broadcasting material for appellant's station. About three weeks after Sammon signed the lease, he called Goldman and told him that he had sold three of the shows but that he needed a delay of approximately four weeks in the starting date of the programs. Goldman granted the request upon Sammon's promise that he would wire appellee informing it of the date the programs would start.

Appellee, in January of 1949, sent the radio station statements of account which had accrued under the transcription lease. When payment was not received,

appellee turned the matter over to its collection department. It was then that Holmes for the first time communicated with appellee in response to a letter concerning the account. This was on April 8, 1949. In his letter Holmes wrote: "Quite some time ago, in October of 1948 if I remember correctly, Mr. Barney Goldman called on us. He spent some time with Paul E. Sammon, who had recently been appointed our commercial manager. Mr. Sammon informed me that he had made an arrangement with Ziv, which would obtain for us a rather large package of Ziv productions at a total cost to us of $150.00 per week. This, to me, meant economic insanity. . . . (Please understand that I have no objections to the shows per se, but rather to the amount of time and money involved. I consider Ziv to be definitely in the top bracket as far as package show production goes and would anticipate using Ziv shows, but only to the amount provided in our operation.)

"At that time I had no doubt but that Mr. Sammon would follow my suggestions, but I realize now that he felt there was a possibility of moving these shows on an economically sound basis, and he delayed action with the feeling that he might be able to offer me a sound method of programing these shows . . . to date we have not used any of these shows, nor do we anticipate their use. I would be glad to talk to Mr. Goldman, with the thought of dealing with Ziv in an economically sound manner.

". . . I am writing to you because the situation is now entirely in my hands, due to the fact that I have accepted Mr. Sammon's resignation. The second reason for acting immediately on this matter is the receipt of your invoice. . . . in the sum of $750,00, presumably for the use of these shows during the month of April.

". . . I hope that this situation can be cleared in an amicable manner, as we are logical consumers of your product. . . .

"Sincerely yours,
s/ John D. Holmes
JOHN D. HOLMES, Manager—WFJS"

In response to this letter, appellee sent its sales agent Goldman to Freeport to see Holmes. He came on April 17, 1949. Mr. Breed was called into the conference. Goldman testified that at no time during his conversation with Holmes and Breed on April 17th did either of them state that Sammon had no authority to make this lease. Breed himself testified at the trial (after judgment had been entered in favor of appellee and subsequently vacated for further proceedings) that Sammon had no authority to make this lease, but he did not deny Goldman's statement that he (Breed) never denied Sammon's authority. Breed further stated that he knew nothing about the lease until Holmes brought it to his attention in April, 1949.

It is undisputed that appellant received the material which appellee shipped to it, as hereinabove set forth, and that it retained the same and made no inquiry of appellee as to what disposition should be made of this material until the Holmes letter of April 8th. Holmes testified that a commercial manager in a station such as WFJS "is a one man department and the commercial manager represents the station on the street for the sale of the station's time."

 The initial question to consider is whether or not the transcription lease giving rise to this litigation is a corporate document. The general rule is that a contract by a corporate officer or agent need not be made and signed in the name of the corporation to render the corporation liable thereon, if it was the intention of the parties to bind the corporation. (13

346

Am. Jur. 1034, sec. 1107; Am. Law Institute, Restatement, Agency, sec. 149; *Western Union Telegraph Co. v. Chicago & P. R. Co.,* 86 Ill. 246.) In the instant case the lease recites that it is between appellee as the lessor and Radio Station WFJS of Freeport, Illinois, as the lessee, and on behalf of appellant it is signed WFJS as the lessee by Paul E. Sammon, commercial manager. WFJS is not a separate corporate entity but is merely the name under which appellant conducts its radio station. Appellant was thus holding itself out to the public as owning and operating this radio station under the name and description of its call letters, WFJS. It seems clear to us then that when Radio Station WFJS is referred to in the lease as the lessee, that appellant is bound to recognize the name which it holds out to the public in connection with the enterprise that it is operating. A reading of the lease shows that it was clearly the intention of commercial manager Sammon and appellee that the lease be binding on WFJS and appellee, and since appellant was operating the radio station under that name, appellant was in fact the real lessee. Every provision in the lease negatives the interpretation that Sammon, as an individual, was to be bound. The evidence further shows that Sammon and his predecessor, Fenz, disclosed their principal, the appellant, in their negotiations with appellee concerning the purchase of transcription material for broadcasting purposes. In determining whether it is the intention of the parties to bind the corporate principal or to bind the purported agent individually, all of the facts and circumstances surrounding the making of the contract are properly considered by the court. (*Frankland v. Johnson,* 147 Ill. 520, 525.) Appellant has cited the cases of *Stobie v. Dills,* 62 Ill. 432; *Sheridan v. Pease,* 93 Ill. App. 219; *Mears v. Morrison,* 1 Ill. 223, and *Sperry v. Fanning,*

347

80 Ill. 371, as holding that before a corporation can be bound on a written instrument, the corporation's name must be used on the face of the instrument and that its name must be used in the signing of the instrument by an authorized officer or agent. We have read these cases and do not find that they sustain this proposition.

██ Although neither side called Sammon as a witness, the record clearly shows that he was an agent of appellant. The real controversy is as to what authority, if any, he had, either express or apparent. The title of "commercial manager" had been conferred upon him by appellant, and he used appellant's letterhead in the negotiations on behalf of appellant with appellee. Holmes, his immediate superior, said that Sammon "represented Station WFJS on the street for the sale of the station's radio time and programs." Holmes never advised Sammon that he had no authority to enter into the disputed lease but merely that it was very unwise. Holmes directed Sammon to get the matter straightened out, and later he took the situation entirely out of the hands of Sammon in order to handle it himself. His letter of April 8, 1949, to appellee does not question Sammon's authority but merely the judgment he exercised in entering into the lease because of the great cost of the programs which he purchased. It is admitted that Sammon had previously purchased one other package of shows on behalf of appellant. Even though no express authority is conferred upon an agent, his acts and contracts within the scope of the apparent authority conferred upon him are binding upon the principal. (*Northern Illinois Coal Corp. v. Cryder*, 361 Ill. 274; *Faber-Musser Co. v. William E. Dee Clay Mfg. Co.*, 291 Ill. 240.) There is no direct proof that Sammon had express authority to execute this lease. As to his appar-

ent authority, the proof shows that he held the title of commercial manager and that it was his business to sell radio programs for Station WFJS. In order to sell these programs, he would necessarily have to have something in the way of material to sell. In interesting a prospective client to purchase radio time, it would be highly advantageous, if not absolutely necessary, to have radio programs to demonstrate and sell. This, as we understand this record, is what Sammon purchased from appellee. Holmes knew that he purchased these programs. He knew that Sammon was trying to sell them "on the street," and that he had sold at least three of them. Goldman knew that Sammon's principal duties at WFJS was to sell radio time and programs when he negotiated with him.

In 13 Am. Jur. 870, sec. 890, the rule as to apparent or ostensible authority is stated as follows: "It is a fundamental and well-settled rule that when, in the usual course of the business of a corporation, an officer or other agent is held out by the corporation or has been permitted to act for it or manage its affairs in such a way as to justify third persons who deal with him in inferring or assuming that he is doing an act or making a contract within the scope of his authority, the corporation is bound thereby, even though such officer or agent has not the actual authority from the corporation to do such an act or make such a contract. This authority is known as apparent or ostensible authority. This apparent authority is materially the same and is based upon the same principles as authority by estoppel. Stating the rule in terms of estoppel, a corporation which, by its voluntary act, places an officer or agent in such a position or situation that persons of ordinary prudence, conversant with business usages and the nature of the particular business, are justified in assuming that he has authority to perform

349

the act in question and deal with him upon that assumption is estopped as against such persons from denying the officer's or agent's authority."

As heretofore pointed out, Holmes learned at once that Sammon had entered into this transcription lease with appellee. He did nothing about it for approximately six months and even then he never repudiated the transaction but merely questioned the wisdom of Sammon in entering into it. This knowledge of Holmes concerning this lease was the knowledge of appellant, as Holmes was its manager. A manager is a person appointed or designated to manage the affairs of another and is the term applied to the representatives of a corporation who are authorized to manage its affairs. (*Hodges v. Bankers Surety Co.*, 152 Ill. App. 372.) A corporation can act only through its agents. As stated in 13 Am. Jur. 935, sec. 983: "The acquiescence of a corporation which will amount to ratification of an unauthorized act may be evinced by mere silence under circumstances giving rise to a duty to repudiate the transaction; a corporation cannot stand by, after it has learned of an unauthorized act or contract made or entered into by its officer or agent, and have its benefit if it should prove to be favorable and reject it if it should prove unfavorable." It was the imperative duty of appellant to repudiate the lease entered into by Sammon promptly if it were unauthorized. Silence under such circumstances that, according to the ordinary experiences and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which ratification can be found. (*Searing v. Butler*, 69 Ill. 575; *Ward v. Williams*, 26 Ill. 447.)

After a careful review of this record, we conclude that the transcription lease involved in this proceeding was in fact and in law the lease of appel-

350

lant. It was ratified by appellant with full knowledge of all of the facts and circumstances attending the transaction. The judgment of the trial court is sustained by the evidence and the applicable law and that judgment will be affirmed.

*Judgment affirmed.*