RICHARD A. KUTZLER et al., Plaintiffs-Appellees, v. GERALD T. BOOTH et al., Defendants-Appellants.

(No. 73-394;

Second District (2nd Division)—April 24, 1975.

John F. Grady, of Waukegan, for appellants.

Collins, Stepanich, & Collins, of Waukegan (Thomas P. Stepanich, of counsel), for appellees.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

· This is an appeal by all three defendants from a judgment in the amount of $16,900 entered on a jury verdict in favor of both plaintiffs on Count IV of the complaint. Count IV charged that the defendants had breached an agreement to pay plaintiffs that sum in full settlement of plaintiffs' claim against Heritage Art Guild, Inc. ("Heritage"), and against Gerald T. Booth and Edward L. LaMartin, individually. The jury also found against defendants on their counterclaim for the same amount.

Defendants argue that the trial court erred in refusing their motions for a directed verdict at the close of all the evidence. The motion was based on the ground that there was no evidence to support a judgment (1) in favor of plaintiff, Laura Kutzler, or (2) against LaMartin, or (3) against Booth, or (4) against Heritage.

Plaintiffs, Richard Kutzler and his wife, Laura, operated a trucking business under the name of Gladstone Carriers ("Gladstone"). This business was losing money. Because Gladstone did not have ICC authority, they operated the business through Corey and Evans, which did, and for the use of the Corey and Evans certificate Gladstone paid 25% of its gross annual receipts of about $400,000. Among Gladstone's accounts were five substantial corporations. In the summer of 1969, Kutzler had several conversations with LaMartin, his accountant, and later with Booth, concerning the possibility of a new trucking venture. Booth was to furnish financing and utilize Heritage, a then dormant corporation of which Booth was the sole shareholder. They then entered into a contract to acquire the stock of Vanek Brothers (principally because Vanek Brothers had an ICC authority), and later assigned that contract to Heritage. Heritage also acquired Kutzler's title to tractors and trailers which were subject to lien, other personal property such as tools and parts, and Gladstone's trucking customers which, at the time of trial, still represented the bulk of Heritage's business.

Kutzler, LaMartin and Booth at that time orally agreed, according to Booth's testimony that Booth was to furnish about $125,000 for this venture, hold all the stock until his advance was returned to him from the profits, whereupon Kutzler, LaMartin and Booth would each be entitled to one-third of the shares of stock in Heritage. Kutzler testified there was no such condition to his entitlement to a one-third interest in the stock of Heritage. LaMartin testified that Kutzler "was to get whatever equity he had" in the equipment "plus or minus any indebtedness that he has * * * and receive one-third interest in the stock after Mr. Booth was paid off." They agreed that LaMartin was to keep the books and run the office, and Kutzler was to be operations manager.

In October of 1969, Booth, in contemplation of a business trip to Japan, and in order "to protect" the interest of Kutzler and LaMartin in Heritage

and enable Booth to "keep his word" of giving each a one-third interest, called his insurance agent, took out a short-term life insurance policy on his life in an amount to pay back the money Booth loaned Heritage, if anything happened to him, and "they could then continue to own and operate the company." Booth then executed an assignment to Kutzler and LaMartin "jointly" of the proceeds of such policy "to be used to pay the notes of Heritage * * *," and an assignment to Kutzler and La-Martin of 66⅔% of Heritage's shares which was stated to be "in lieu of a formal stock transfer" and "binding * * * irrevocably, until such time as the stock is transferred, or a subsequent agreement is arrived at by all parties."

They began operating the new trucking venture on October 1, 1969. LaMartin became vice president and secretary of Heritage in February or March of 1970. He devoted part of his time to Heritage until April, 1970, when he began devoting full time. His annual salary was $15,000 except for the period prior to April when it was "pro rated" on that basis. Booth took no salary as president and although he reserved the right to make major management "commitments," he was relatively inactive in the business. Laura Kutzler was employed by Heritage, doing office work, at $100 per week until August, 1970, when she left. Richard Kutzler remained until September of 1970, when he decided to and did leave because of "disagreements with Mr. LaMartin over the operation of the business." Kutzler testified that after one such incident in July of 1970, he spoke to LaMartin and to Booth about his problems; that Booth told Kutzler to talk to LaMartin about anything he wanted to talk to Booth about, that LaMartin "has complete say-so, he was running it," and that Booth was giving LaMartin one-half of Booth's interest in Heritage "to oversee his [Booth's] two-thirds." While Booth did not contradict this testimony, he testified that he did not tell Kutzler that LaMartin was speaking on his behalf in matters relating to the company.

Kutzler testified that shortly before he left he asked LaMartin what his "one-third" interest was worth. LaMartin said he would work up the figures. Kutzler told LaMartin that he needed $16,900 to pay up a $16,900 tax liability to Internal Revenue, and that his interest in Heritage was certainly worth more than that. LaMartin said "Yes", and Kutzler said he would "settle" for that amount "to be able to leave Heritage." LaMartin testified that he never discussed that figure with Kutzler, and never set a value on Kutzler's interest in Heritage.

Kutzler further testified that a few nights later he had a conversation with LaMartin and Booth during which Booth said he and LaMartin "had looked over the figures" and "they agreed that the $16,900 was a fair figure and they asked if I was still happy with it, I said yes, that I

would accept it." Booth then told him that his [Kutzler's] "next step" should be to check with Internal Revenue and ask "if they would accept Mr. Booth's and Heritage's word that they would pay my government lien." On the following day, Kutzler testified, he called Internal Revenue and was told they would not release the lien on Mr. Booth's word that "they" would pay. Kutzler testified to a further conversation with Booth about 2 weeks later during which Booth said that LaMartin "decided not to give me [Kutzler] $16,900, and * * * that if I took him [meaning Booth] to court and if I won he would pay me what I have coming, if he won he would save $16,900." Booth denied these conversations and denied any agreement to pay Kutzler that amount.

Both Kutzler and his wife testified to a conversation with LaMartin at his home after Kutzler left Heritage, during which LaMartin said he knew they had money coming and if necessary he "would mortgage" his home to pay that money. Kutzler suggested that LaMartin talk to Paul Maton, Kutzler's lawyer. A few weeks later ("sometime in 1971") Kutzler was in Maton's office and, when he was told by Maton that LaMartin had not reached him, Kutzler telephoned LaMartin. In that telephone conversation Kutzler testified that he said: "You still agree you do owe me some money," and LaMartin responded "Yes, * * * I agree we owe you $16,900." Mr. Maton listened in on this conversation on another line without LaMartin's knowledge and in his testimony he substantially corroborated that conversation.

Mr. LaMartin denied the conversation about mortgaging his home and, as noted above, denied ever discussing the figure of $16,900 with Kutzler.

At the conclusion of all of the evidence defendants moved for a directed verdict. Plaintiffs thereupon moved to withdraw Counts I and II and the trial court dismissed those counts, but denied defendants' motion for a directed verdict as to Counts III and IV. (In view of the fact that no question is presented as to Counts I and II, and no issue is raised as to Count III, or as to defendants' counterclaim, we need not burden this opinion with a summary of their purport.)

Defendants first contention is that there is no evidence in the record that anyone promised to pay Laura Gail Kutzler $16,900. We agree. Indeed at oral argument counsel for plaintiffs conceded as much. Therefore, we hold that the trial court erred in refusing to direct a verdict which would preclude a judgment in favor of plaintiff, Laura Gail Kutzler.

■■ We now consider defendants' contention that there is no evidence to support the judgment against LaMartin. While Kutzler testified that LaMartin told him that $16,900 would represent a fair figure for Kutzler's interest in Heritage, and that he thought Kutzler had money coming and would mortgage his home to pay it, nowhere in the record is there testi-

mony that would amount to a personal undertaking on the part of La-Martin to pay that sum. Indeed, there is nothing in the record to show that LaMartin was in any manner individually obligated to pay any sum to Kutzler. Booth was the sole shareholder of Heritage, and LaMartin, like Kutzler, was expecting at some future time to receive one-third of its shares. At most, any commitment by LaMartin to pay would have to be construed as being in a representative capacity, either on behalf of Booth (since plaintiffs argue that LaMartin was acting as Booth's agent), or Heritage. Therefore, we hold that the trial court erred in refusing to direct a verdict in LaMartin's favor.

Defendants further contend that there was no evidence to support the judgment against Booth or against Heritage. The evidence is clear that Kutzler, LaMartin and Booth all agreed that the new trucking venture would be conducted by Heritage, a corporation of which Booth was the sole shareholder. Thereafter, Kutzler and LaMartin received their salaries from Heritage through which all business was operated. There is evidence that LaMartin and Booth agreed that $16,900 was a fair figure for Kutzler's "one-third" of Heritage. There is also evidence from which the jury could find a promise to pay that amount, namely from Kutzler's testimony as to LaMartin's statement that, We owe you $16,900,"[1] and Booth's statement (after Booth asked him if Kutzler was happy with that figure and Kutzler replied, "Yes * * * I would accept it") suggesting as Kutzler's next step, that Kutzler check with Internal Revenue to determine if they would accept Booth's and Heritage's word that they would pay the tax lien. (That lien was later satisfied by Kutzler for $10,766.)

Our examination of the record discloses no evidence of any agreement by Booth individually to pay Kutzler for his interest in Heritage. The conversation between Kutzler, Booth and LaMartin to which Booth testified, during which Booth "agreed that $16,900 was a fair figure" for that interest and asked Kutzler if he "was still happy with it," amounts only to a statement by Booth as to fairness and an inquiry as to Kutzler's reaction to it. It did not constitute an agreement by Booth individually to pay that or any amount; neither did the ensuing colloquy to which Kutzler testified supply any agreement by Booth individually to pay any amount.

Plaintiffs' counsel argues in his brief and on oral argument that Heritage was not a true "separate corporate entity," and in effect seeks to hold Booth (and LaMartin) liable on the theory of piercing the corporate veil. This case was neither filed nor presented in the trial court on that

---

[1] This testimony was allowed into evidence by the trial court only against Heritage.

theory. On the contrary, Count IV of the complaint on which the jury verdict was returned alleged (as did other counts not here relevant) that Heritage was an Illinois corporation. It made other allegations which recognized at least by implication the separate corporate entity of Heritage. There was no allegation that Heritage was a sham and none which would furnish a basis for piercing its corporate veil; there was no prayer for such (equitable) relief in this law action. Indeed, the evidence offered at the jury trial was consistent with a full recognition by all parties of Heritage's separate corporate entity. The jury's return of a verdict against Heritage, as well as plaintiffs' submission of a form of verdict which enabled the jury to do so, confirms plaintiffs' recognition of Heritage's separate corporate entity. The mere fact that Booth was its sole shareholder and may have referred to it as "my" corporation is of no consequence under the circumstances of the case at bar. The trial court therefore erred in refusing to direct a verdict in favor of Booth.

■■ The defendants argue that there is no evidence to support the judgment against Heritage. Booth was its president and sole shareholder (except for the "assignment" he executed in October of 1969, but did not effectuate, of 66⅔% of Heritage's stock to LaMartin and Kutzler). He regarded Heritage as "my corporation." He did not deny Kutzler's testimony that he gave "complete say-so" to LaMartin, and that LaMartin "was running it" in order to "oversee" Booth's two-thirds interest. La-Martin was vice president of Heritage and in effect its active managing officer, since Booth was relatively inactive and appeared at the office only occasionally. From the manner in which LaMartin was permitted to conduct the business of Heritage, his authority to compromise Kutzler's claim against Heritage may be inferred. (19 Am.Jur.2d *Corporations* § 1193.) LaMartin having been clothed with apparent authority by Heritage to do so, the jury had sufficient evidence before it to justify its verdict against Heritage. (See *Freeport Journal-Standard Publishing Co. v. Frederic W. Ziv Co.*, 345 Ill.App. 337, 348, 350.) (We note that defendants tendered no jury instructions raising any questions concerning Booth's or LaMartin's power or authority to bind Heritage, and none were given.)

■■ Finally, defendants contend that Heritage was prejudiced by the admission, over objection, of improper evidence, *i.e.*, the testimony of Kutzler and that of his wife that LaMartin said that Kutzler "had something coming" and would mortgage his home to "take care of it," and the testimony as to Kutzler's telephone conversation with LaMartin late in 1971 during which LaMartin said "Your equity * * * is $16,900." Defendants contend that their objections to this testimony should have been sustained on the ground that there was no showing that such state-

ments by LaMartin were within the scope of his authority as vice president of Heritage. As we stated above, there was adequate evidence of LaMartin's authority to bind Heritage to agree to pay the sum of $16,900 to Kutzler. The testimony was therefore admissible against Heritage, and the trial court's refusal to direct a verdict in favor of the corporation was proper. Therefore, the judgment entered by the circuit court of Lake County in favor of plaintiff, Laura Kutzler, is reversed; the verdict against defendants LaMartin and Booth is also reversed; and the judgment against Heritage in the sum of $16,900 in favor of plaintiff, Richard Kutzler, is affirmed.

Reversed in part and affirmed in part.

THOMAS J. MORAN and DIXON, JJ., concur.